401 So.2d 522 (1981)
Phillip THOMAS, Jr., Plaintiff-Appellant,
v.
McINNIS BROS. CONSTRUCTION, INC., et al., Defendants-Appellees.
No. 14572.
Court of Appeal of Louisiana, Second Circuit.
June 8, 1981.
Rehearing Denied July 15, 1981.
*523 Brown, Williams & Tucker by Jack A. Williams, Shreveport, for plaintiff-appellant.
Mayer, Smith & Roberts by Mark A. Goodwin, Shreveport, for defendants-appellees.
Before HALL, JASPER E. JONES and FRED W. JONES, Jr., JJ.
En Banc. Rehearing Denied July 15, 1981.
JASPER E. JONES, Judge.
Plaintiff, Phillip Thomas, Jr., appeals a judgment in this worker's compensation case awarding him $8,114.91 for medical expenses, penalties and attorney's fees against his employer, McInnis Brothers Construction, Inc., and its insurer, Rockwood Insurance Company. Defendants answer the appeal asking that the awards of medical expenses, penalties, and attorney's fees be reversed.
Plaintiff injured his back on July 17, 1979 while operating a jackhammer for McInnis on the Strand Theater project. The next day plaintiff went to see Dr. Gordon Mead, an orthopedic surgeon. Dr. Mead diagnosed plaintiff as having an acute thoracic and lumbar sprain. He admitted plaintiff to Highland Hospital for bed rest and traction on July 27, 1979. Plaintiff was discharged on August 2, 1979, but was still experiencing pain. Dr. Mead admitted plaintiff to the hospital on August 14th to have a myelogram performed. No abnormalities were reflected by the myelogram. While at the hospital, plaintiff was seen by Dr. Kenneth Gaddis, a neurologist, who found plaintiff's neurological examination to be normal. Plaintiff was discharged on August 20th with a final diagnosis of lumbosacral strain. Dr. Mead believed that on August 22nd plaintiff could return to work. Dr. Mead opined that plaintiff could do all the work required of him, including use of the jackhammer.
Upon receipt of the information from Dr. Mead that plaintiff could return to work, defendant ceased compensation payments. Defendant paid plaintiff compensation benefits of $141 per week through August 28th.
On August 23, 1979, plaintiff went to see Dr. Matthew Green, an orthopedic surgeon. Dr. Green diagnosed a probable lumbosacral sprain and recommended that plaintiff go see Drs. Osborne and Phillips at the Pain Center. Dr. Green made the referral to the Pain Center because his examination disclosed very little findings to justify plaintiff's complaint of back and leg pain.
Plaintiff went to see Dr. Donald Ray Smith, a neurosurgeon, on September 5, 1979. Dr. Smith saw no reason that plaintiff could not return to work, and no reason for any limitations on plaintiff's work.
Plaintiff was admitted to the Pain Center on September 30, 1979. He was discharged from the Pain Center on October 26, 1979 with an order of limited work duty for the next ninety days (no lifting of objects heavier than 20 lbs., no prolonged bending or stooping).
Plaintiff filed this suit for worker's compensation benefits on April 30, 1980, asking that he be recognized as permanently and totally disabled.
The trial court, in a lengthy written opinion, found that plaintiff did not establish he was disabled so as to be entitled to additional weekly compensation benefits. The trial court held that defendants had properly stopped the worker's compensation payments on August 28, 1979, and that plaintiff was not entitled to additional weekly payments. The trial judge found the $5,079.60 hospital expenses incurred at the Pain Center to be necessary expenses for which defendants were liable. The trial court found defendants were arbitrary and capricious in failing to pay this bill and assessed penalties and attorney's fees.
*524 The issues on appeal are (1) is plaintiff entitled to weekly benefits after August 28, 1979? (2) is plaintiff entitled to the medical expenses incurred at the Pain Center? (3) were defendants arbitrary in not paying the bill from the Pain Center and therefore is plaintiff entitled to penalties and attorney's fees? and (4) is the $2,000 attorney fee excessive?
PLAINTIFF IS ENTITLED TO WORKER'S COMPENSATION BENEFITS FROM AUGUST 28TH THROUGH OCTOBER 26, BUT IS NOT ENTITLED TO ANY FURTHER BENEFITS.
The trial judge in his written reasons analyzed in detail the testimony of plaintiff's examining and treating physicians from date of his injury through September 25th and summarized his findings as follows:
"The incident occurred July 17, 1979, according to plaintiff. As of September 25, 1979, plaintiff had been examined by three orthopedic surgeons, one neurologist and one neurosurgeon. None of them, according to our understanding of their testimony, found anything on which they could medically rely in substantiating plaintiff's complaints of pain. To the contrary, his treating orthopedic physician, Dr. Mead, had released him on August 22, after extensive examination and treatment, as being able to return to his regular duties. The last examining physician, Dr. Smith, had pronounced plaintiff able to return to his regular duties on September 5 and reaffirmed that on September 24."
We find the testimony of these physicians fully supports the trial judge's conclusions with regard to their examinations and treatment of plaintiff.
The trial judge made the following correct factual finding with regard to plaintiff's course of treatment in the Pain Center:
"At the suggestion of Dr. Green, who had been unable to find any justification for plaintiff's complaints, plaintiff was accepted at the Shreveport Pain Center, which is physically located in Doctors Hospital and is apparently operated by Dr. Phillip Osborne, a general practitioner who has specialized in the field of chronic pain for several years, and Dr. James Phillips, a psychiatrist. While the Center is located in the hospital, the participants in the program are not in actual need of hospitalization as that term is generally used, but they are apparently there primarily for observation and testing. For example, plaintiff was required to leave the hospital and return to his home each weekend. Plaintiff remained under the observation of Drs. Osborne and Phillips from September 30 to October 26, when he was discharged to return to work, but with light duty being specified for 90 days."
The plaintiff in brief does not assign as error the trial judge's evaluation of the testimony of the three orthopedics, the neurosurgeon, or the neurologist, but rather relies upon the testimony of Drs. Osborne and Phillips to support his claim for additional compensation.
The trial judge gave an extensive evaluation of the testimony of Drs. Osborne and Phillips in his reasons for judgment concerning their treatment of plaintiff between September 30 and October 26, as follows:
"However, upon a careful study of their testimony, we conclude that neither doctor has stated that plaintiff could not perform all of his duties, including use of the jackhammer, but that they recommended avoidance of the latter because of a possibility of an injury which might occur and due to plaintiff's mental state it might be more difficult to cure his physical problem in the future. In short, both doctors found plaintiff to be a hypochondriac and, indeed, both came very close to calling him a malingerer. The possibility of future difficulty is speculative at best. Neither found any physical disability. Both found that plaintiff had a motivation problem which was essentially connected with the financial reward *525 which might be generated as a result of this lawsuit. This was also referred to as secondary gain by the doctors. The upshot of all of this is that again we had medical testimony which failed to substantiate plaintiff's claims or complaints, but doctors who repeatedly stated they were unable to justify those complaints. In fact, we read Dr. Osborne's and Dr. Phillips' testimony as doubting the validity of plaintiff's complaints.
In summary, the best that we can draw from the testimony of Drs. Osborne and Phillips is that plaintiff has an emotional problem which appears to be of a hypochondriac nature and which is also affected by his desire for economic gain. Neither doctor suggests that plaintiff can not perform the physical duties which he formerly engaged in as a laborer. Dr. Phillips, however, expressed concern that plaintiff might receive an injury to his back and this would make it `twice as hard the second time around', but this would be purely because of his emotional problems and not because of any physical or organic problem (T.62). It did not matter to Dr. Phillips whether the emotional problems stemmed from plaintiff's personal life or from whatever cause. He simply concluded as follows:
A. I do not recommend that he return to manual labor because, as I have previously stated, he has the emotional make-up, so that if he ever injures his back again he will aggravate it with emotional problems.
Q. And the source of those emotional problems, Doctor, doesn't it matter? You don't have any idea what the source of those problems is?
A. No sir. (Tr. 63, 1.14-21)
We must conclude that Drs. Osborne and Phillips have really added nothing to what had already been said by virtually every doctor who had seen plaintiff, i. e., there is no physical reason why he could not return to the duties of his regular employment as a laborer. They say, however, that while he is not disabled to work, should he sustain an injury, it might become disabling because of his motivational problems. Based on this, we are unable to say that plaintiff has established that he is in fact disabled, even partially, so as to be entitled to additional compensation benefits beyond those which have already been paid to him."
We find the trial judge's evaluation of the testimony of Drs. Osborne and Phillips to be substantially correct and to be a fair evaluation of the totality of their testimony relating to the condition of plaintiff at the time of his discharge on October 26, 1979. However, we find that the trial judge omitted from his written reasons the finding of Dr. Osborne during the early period of plaintiff's hospitalization that plaintiff had a difference of 5% temperature in the right and left leg. Dr. Osborne believed this indicated a sympathetic reflex problem caused by the myoligamentous strain. Dr. Osborne testified:
"This can represent soft tissue change. It can represent some neurological change from injury that might be creating a reflex dystrophy. Because of these findings consulation was obtained with anesthesia. And, since orthopedic evaluation had been within normal limits, we felt that the only possible physical thing the patient could have should be alleviated with the use of interthecal steroids and/or regional block. So, consulation was obtained with anesthesia, and this procedure was done. After this procedure the temperature changes were not present.
* * * * * *
And we felt that the only physical abnormalities that had been present at the time of evaluation were corrected by anesthesia." (Tr. 7.60).
We conclude that this physical abnormality which Dr. Osborne treated and corrected, and which he believed related to plaintiff's injury of July 17, 1979, supported the trial judge's finding that plaintiff's hospitalization of September 30 to October 26 was a necessary medical service within the contemplation of LSA-R.S. 23:1203.
Plaintiff contends in brief that he is disabled because he is having pain due to an *526 emotional problem. He contends the pain has a "psychiatric basis" which is related to his on the job injury. He argues that the testimony of his psychiatrist, Dr. Phillips, establishes his disability based upon this mental condition.
In Victoriana v. Orleans Parish Sch. Bd., 346 So.2d 271 (La.App.4th Cir. 1977), the court recognized the compensability of disability caused by a disabling mental condition relating to on the job physical injury:
"Regarding the second contention, it is now our settled jurisprudence that recovery may be had in compensation cases for disability resulting from a mental condition. The condition must be proven, as any other disabling injury, by a preponderance of the evidence, and it must be shown that the disability was causally connected to the work related accident. In such cases the court must proceed with utmost caution and exercise extreme care in view of the nebulous characteristics of the condition, and the possibility of the symptoms being easily feigned; the evidence in these cases should be scrutinized carefully and every precaution taken to guard against unjustified claims." Id. at 273.
See also Jackson v. International Paper Company, 163 So.2d 362 (La.App.3d Cir. 1964); Elliott v. Insurance Company of North America, 159 So.2d 313 (La.App.2d Cir. 1963).
These cases require the plaintiff to establish with clear and convincing evidence the existence of a disabling mental condition and plaintiff here has completely failed to meet this burden of proof. While there are isolated statements in Dr. Phillips' testimony to support plaintiff's contention, the totality of his testimony supports the trial judge's conclusion that Dr. Phillips' examination did not establish plaintiff to be disabled from a mental condition related to his on the job injury.
The trial court found plaintiff had exaggerated his complaints to several of his examining doctors and in some instances deliberately gave false responses to the tests being performed by the doctors. The plaintiff had misrepresented his work history following his discharge to return to work, both in answers to written interrogatories and his oral deposition. Plaintiff's conduct in this regard supports the trial court's finding that plaintiff lacked credibility.
We do not find the trial judge to be clearly wrong in rejecting plaintiff's claim that he is disabled by a job related mental condition.
As pointed out earlier in this opinion there was objective evidence of deviation of temperature in plaintiff's legs which was found by Dr. Osborne during plaintiff's hospitalization in the Pain Center. Dr. Osborne explained the cause of this temperature deviation as related to plaintiff's on the job injury, and believed this positive physical finding substantiated plaintiff's complaint of pain. Dr. Osborne treated and corrected the condition and concluded plaintiff should have no further pain from this abnormality. We find that plaintiff had the pain corrected by Dr. Osborne during the period subsequent to August 28th (which was the date upon which plaintiff's compensation was terminated). Plaintiff is not required to work in pain. Plaintiff is entitled to weekly compensation during the period between August 28 and October 26 when he was discharged from the Pain Center. While this is a finding of fact inconsistent with the trial judge's total rejection of further weekly compensation benefits, it is not totally contrary to the trial judge's conclusions since he recognized that plaintiff's stay in the hospital from Sept. 30 to October 26 created necessary medical expenses. We have found the trial judge was correct in awarding the Pain Center hospital bills, and the same evidence which supports the hospital expense award requires the award for weekly compensation covering the period between August 28 and October 26th.
Our award of the additional weekly compensation is consistent with the rules related to appellate review of worker's compensation cases as expressed in the case of *527 Crump v. Hartford Acc. & Indem. Co., 367 So.2d 300 (La.1979), and cases cited therein.
As we have earlier pointed out, the evidence in the record fully supports the trial judge's rejection of plaintiff's claim for compensation beyond October 26, 1979.
WERE DEFENDANTS ARBITRARY IN REFUSING TO PAY PLAINTIFF BENEFITS UNDER WORKER'S COMPENSATION LAW SUBSEQUENT TO AUG. 28, 1979?
LSA-R.S. 22:658 provides:
"All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefore, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. * *."
This statute is penal in nature and therefore must be strictly construed. Penalties and attorney's fees are not assessed unless it is clearly shown that the insurer was arbitrary, capricious and without probable cause in discontinuing payments. The burden of proof is on the claimant to prove that the failure to pay is arbitrary and capricious. Breaux v. Marine Electric & Reliance Insurance Co., 369 So.2d 196 (La. App.3d Cir. 1979); Henley v. F. G. Sullivan, Jr., Contractor, Inc., 385 So.2d 497 (La. App.1st Cir. 1980).
In defendants' answer to plaintiff's petition, they acknowledged they had ceased payments after receiving communication of Dr. Mead's final report, which informed them that plaintiff was able to return to work. The termination of compensation payments was based on this medical report of plaintiff's treating physician. Defendants' action of terminating payment of worker's compensation benefits was justified by their receipt of this report. Defendants' action was not arbitrary and capricious.
The fact that plaintiff was admitted to the Pain Center some thirty days after Dr. Mead's discharge does not in and of itself establish that the hospitalization was a necessary medical service required by plaintiff's compensable injury. Though defendants later acquired knowledge of the hospitalization, this does not create any obligation on the part of defendants to pay the bill until they have been supplied with the medical reports indicating the hospitalization was necessary treatment of plaintiff's compensable injury. The record does not disclose that defendants had information establishing that plaintiff was disabled subsequent to Dr. Mead's report. The record does not reflect that defendants received any medical reports from other physicians that treated plaintiff subsequent to Dr. Mead's discharge which indicated plaintiff was disabled and in need of further treatment. All we can discern from the record is that defendants first acquired information of the opinions of other physicians that plaintiff was disabled at the time that these doctors testified at trial. There is nothing in the record to support a contention that defendants at a subsequent time received any information from any other doctor who examined or treated plaintiff that his disability continued subsequent to Dr. Mead's examination. The list of physicians who examined plaintiff at the Pain Center contained in plaintiff's answer to defendants' interrogatories does not reflect the opinions of these doctors with regard to whether *528 plaintiff's disability continued or required additional hospitalization.
Because of the careful diagnostic procedures of Dr. Mead and the concurrence of at least one other orthopedic, a neurologist, and a neurosurgeon, in his general conclusions any contrary medical reports indicating continuing disability and need for further treatment would have had to have been particularly persuasive before defendants would have been placed in a posture of being arbitrary and capricious.
Only the testimony of Dr. Osborne supports the additional weekly compensation which we have awarded and provides any substantial justification for the lengthy hospitalization which commenced September 30, and even if defendants had been given his opinion by report or deposition, we conclude that defendants would have been justified in relying upon the other medical opinions indicating no disability. Defendants would not have been arbitrary and capricious under these circumstances to have litigated their further liability to plaintiff.
The trial court was clearly wrong in finding defendants arbitrary and ordering them to pay penalties and attorney's fees.
For the reasons assigned the judgment appealed is amended as follows:
Plaintiff is awarded weekly worker's compensation benefits in the amount of $141 per week commencing August 28, 1979 and terminating October 26, 1979, together with legal interest on each past due weekly compensation payment from due date until paid.
The award of 12% penalties and $2,000 attorney's fees is REVERSED and plaintiff's demand for penalties and attorney's fees are rejected.
As AMENDED the judgment is AFFIRMED. All costs on appeal are assessed against appellant.